IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JEFF S. HONKUS,                          )
                                         )
          Plaintiff,                     )
                                         )
     v.                                  )          2:13cv1830
                                         )          **Electronic Filing**
CAROLYN W. COLVIN[1], Acting             )
Commissioner of Social Security,         )
                                         )
          Defendant.                     )


## OPINION

### I.    INTRODUCTION

Jeff S. Honkus ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of the final determination of the Commissioner of Social Security

("Commissioner") denying his application for disability insurance benefits ("DIB") under Title II

of the Social Security Act ("Act").  42 U.S.C. §§ 401-433.  Presently before the court are cross-

motions for summary judgment.  The record has been developed at the administrative level.  For

the reasons set forth below, plaintiff's motion will be denied, the Commissioner's motion will be

granted, and final judgment will be entered in favor of the Commissioner and against plaintiff.

### II.  STATEMENT OF THE CASE

### A.    Procedural History

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, succeeding former Commissioner Michael J. Astrue.  Social Security History-Social Security Commissioners, http://www.ssa.gov/history/commissioners.html (as visited on October 21, 2014).  Consequently, Acting Commissioner Colvin is now the official-capacity defendant in this action.  *Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991); FED. R. CIV. P. 25(d).

Plaintiff filed an application for benefits on April 8, 2011 alleging disability since January 30, 2007.[2]  R. 12.  The application was initially denied on January 8, 2011.  R. 56-60. At plaintiff's request, a hearing was held before an ALJ on October 4, 2012.  R. 28-43.  Plaintiff, represented by counsel, appeared and testified.  R. 31-39.  An impartial vocational expert, Mary Beth Kopar, also testified.  R. 39-42.  The ALJ rendered a decision on December 27, 2012 denying plaintiff's application.  R. 9-27.  On December 5, 2013, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. R. 1-6.  This civil action followed.

**B.      General Background**

Plaintiff was born on November 9, 1963, making him forty-three years of age on his alleged on-set date and forty-eight years of age at the time of the hearing.  R. 31, 44.  He is a college graduate.  R. 147, 192.  Plaintiff is single and has no children.  R. 127-28, 204.  He lives with his longtime girlfriend.  R. 145, 168, 407.

Plaintiff worked for ten years as a pharmacist.  R. 52-53, 147, 155-162.  Plaintiff had sufficient earnings to maintain insured status through December 31, 2012.  R. 12, 143. Consequently, to be entitled to DIB plaintiff had to establish that he became disabled on or before that date.  *See* 42 U.S.C. § 414(a).

Plaintiff's work as a pharmacist required him to lift less than two pounds frequently, stand for six to eight hours, and sit for up to two hours.  R. 155-162.  This work was light and skilled in exertional/task level.  R. 21.  Plaintiff was no longer able to do the tasks necessary to perform

---

[2] Plaintiff filed a prior application for DIB on February 25, 2009, alleging disability since November 16, 2006.  The application was denied on April 6, 2009, due to plaintiff's failure to return authorization forms for the release of his medical records.  The prior application was not considered by the ALJ.  R. 12.

this work.  R. 169.  Plaintiff had not worked since January 28, 2007, with the exception of six

weeks of part-time employment from August through September of 2007.[3]  R. 147, 200.

Plaintiff alleged disability due to degenerative disc disease, status post-microdiscectomy.

The record indicates that he suffers from multiple physical impairments, including chronic low

back pain with radiculopathy, lower extremity edema, venous insufficiency, and a hydrocele.

Plaintiff alleged that all of these surfaced or became more pronounced after a November 16,

2006 work-related back injury and subsequent surgery on January 29, 2007.  R. 146.

Plaintiff is less active than he was prior to his injury.  R. 169.  His ability to perform the

activities of daily living is limited by the inability to concentrate or stand for long periods.  R.

168-177.  He generally can take care of his personal needs, such as bathing and dressing, but he

has some difficulty due to pain.  R. 34, 169.  He is usually able to drive.  R. 171-72.  Plaintiff is

able to keep monthly doctor's appointments and shops regularly for necessities.  *Id*.  He does

very little house or yard work, but may do a load of laundry once a week.  R. 34, 170-71.

Plaintiff does not prepare his own meals, but is able to reheat food in the microwave, toaster or

oven.  R. 34, 170.  He enjoys talking on the phone a few times each week and listens to talk radio

daily.  R. 172-73.

When plaintiff is experiencing pain, he spends a great deal of time lying on his back with

a heating pad and a pillow supporting his lower back.  R. 169, 176.  He uses a back brace, warm

moist heat and stretching to treat his pain.  R. 176, 233, 388.  He occasionally uses a TENS unit.

R. 176.  Plaintiff uses compression stockings to treat his lower extremity edema.  R. 176.  He

also takes a variety of medications, which help him get through the day.  R. 34, 176.

Plaintiff testified that his medications give him many side effects, including drowsiness,

---

[3] The ALJ concluded that this was an "unsuccessful work attempt."  R. 14, 155.

decreased concentration, stomachache, severe headaches and dizziness. R. 175-76. He assertedly has to elevate his legs as much as seventy-five percent of the day, depending on his activities, due to edema. R. 35-37. Plaintiff also testified that he uses a cane daily. R. 34-35.

### C. Medical Evidence

#### 1. Physician and Medical History

On November 16, 2006, plaintiff moved a computer monitor at work and immediately felt sharp pain in his lower back. R. 233, 263. Plaintiff's lower back pain increased over several weeks. *Id*. Plaintiff also developed pain and numbness in his left lower leg and numbness in his left hand. *Id*. Plaintiff visited the emergency room at Presbyterian Hospital, where he was advised to undergo additional testing and to continue his then current medication regimen for chronic lower back pain.[4] R. 263, 560.

On December 18, 2006, plaintiff went to Chiropractic Family Health Center. R. 204. He reported constant pain in his lower back radiating to his leg and foot, which he described as burning, tingling, throbbing and sharp. R. 204-05. Dr. Shawn Richey performed an orthopedic evaluation, which was positive for Valsalva's, Braggards, Straight Leg Raise, and Kemps Test. R. 205. Dr. Richey noted severe muscle spasm and taught and tender fibers in plaintiff's lumbar area and ordered MRIs. R. 205-06.

On December 18, 2006, plaintiff had a lumbar MRI at North Pittsburgh Imaging. R. 207. It revealed disc herniation at L4-5 and L5-S1 and bulging discs at L1-2 and L3-4. *Id*.

On January 4, 2007, plaintiff was evaluated by neurosurgeon Matt El-Kadi, MD, Ph.D. R. 233, 388. Plaintiff presented with constant, severe low back pain that radiated into his left leg

---

[4] There is no independent evidence of plaintiff's visit to Presbyterian Hospital in the record. Plaintiff reported the hospital visit as part of his health history. R. 263, 560.

and foot. *Id.* He also experienced moderate, intermittent pain radiating into his right leg and foot, but only when fatigued. *Id.* Plaintiff had experienced only minimal relief from conservative treatment that included rest, position changes, stretching, a heating pad, and OxyContin, Oxycodone, and Neurontin. R. 209, 233, 388. Dr. El-Kadi recommended that plaintiff have a microdisectomy to relieve pressure from the nerve roots. R. 389. He advised that the nerve roots might heal once the pressure was removed, but there was no guarantee that the surgery would relieve plaintiff's symptoms. *Id.* Plaintiff elected to have the surgery. R. 210, 389.

On January 29, 2007, plaintiff underwent back surgery. R. 211. Dr. El-Kadi performed a hemilaminectomy and microdisectomy at L4-5 and a hemilaminectomy at L5-S1. *Id.* There was no disc herniation at the L5-S1 level, but plaintiff did have lateral recess stenosis. *Id.* Dr. El-Kadi was able to decompress both nerves and the lateral recess stenosis at L5-S1. *Id.* His operative notes reflect that plaintiff had a congenitally small canal, very bulky facets, and a significant hypertrophic facet joint on his left side. *Id.* Plaintiff experienced a discernible improvement in his radicular symptoms post-operatively and was discharged from UPMC Passavant the following day. R. 209.

On February 8, 2007, Dr. El-Kadi examined plaintiff. R. 384. Plaintiff reported an eighty-five to ninety percent improvement in his symptoms, but he continued to experience mild lower left extremity pain and severe pain in his right lower extremity. *Id.* Dr. El-Kadi prescribed physical therapy and scheduled a one-month follow up to assess plaintiff's return to work. *Id.*

On February 23, 2007, plaintiff visited Robinson Physical Therapy and Health Center, Inc., for an evaluation by Scott Colombo, PT, CSCS ("PT Colombo"). R. 293. Plaintiff reported experiencing radicular symptoms and sharp and intermittent pain in his lower back, particularly

when moving from a supine position. *Id*. He explained that he had to be able to stand and reach to perform his job. *Id*. Plaintiff reported to physical therapy on February 26, February 28, and March 7, 2007, but did not attend therapy on March 2 or March 5, 2007. R. 289-297.

On March 8, 2007, plaintiff followed up with Dr. El-Kadi. R. 228, 382. Plaintiff again reported an eighty-five to ninety percent improvement in his symptoms, but continued pain in his right lower extremity and residual numbness. *Id*. Dr. El-Kadi ordered additional MRI testing to evaluate plaintiff's symptoms and address his return to work. *Id*.

Plaintiff attended physical therapy on March 9 and March 14, 2007, but missed or canceled appointments on March 9, March 12, and March 16, 2007. R. 283-86.

On March 26, 2007, plaintiff had an MRI of his lumbar spine. R. 222. It revealed that plaintiff had large posterior intervertebral disc herniations on the right at L4-5 and at the focal left posterior at L5-S1. *Id*. The interpreting radiologist noted post-operative scar and granulation tissue at the left L4-5 and L5-S1 levels. *Id*. The MRI also revealed evidence of degenerative disc disease and mild to moderate spinal stenosis at L3-4 from mild degenerative disc bulge and mild facet hypertrophy. *Id*.

On April 4, 2007, plaintiff returned to physical therapy. R. 278. PT Colombo determined that plaintiff's cervical, upper extremity, lower extremity and forward bend ranges of motion were all normal. *Id*. Plaintiff had a ten degree limit in right side bending and his backward bending was five degrees past neutral. *Id*.

On May 2, 2007, Dr. El-Kadi examined plaintiff, who was still experiencing numbness and weakness in his left hand. R. 226, 380. Plaintiff reported a ninety percent improvement in his left lower extremity. *Id*. Dr. El-Kadi's neurological exam was unremarkable, other than a positive Tinel's sign at the left elbow. *Id*.

Plaintiff had not followed Dr. El-Kadi's March 29, 2007 instructions to obtain a functional capacity evaluation. R. 226, 282, 380. Dr. El-Kadi emphasized the importance of the exam and advised plaintiff to return to work based on the recommendations of his physical therapist. *Id*. Dr. El-Kadi discharged plaintiff from acute care. *Id*.

On May 15, 2007, plaintiff had a functional capacity evaluation. R. 263-66. PT Colombo determined that plaintiff could perform light-medium work, but recommended four weeks of work hardening. R. 266. Plaintiff began work hardening on June 18, 2007, and attended additional sessions on June 20, June 21, June 22, and June 25, 2007. R. 253-57.

On June 26, 2007, plaintiff presented to physical therapy with bilateral pitting edema in his lower extremities. R. 246, 249, 250. He also had shortness of breath with exertion and reported a recent weight gain of twenty pounds. *Id*. Due to the sudden onset of edema and plaintiff's family history of heart disease, PT Colombo discharged plaintiff from physical therapy and advised him to contact a cardiologist. *Id*.

On June 29, 2007, cardiologist Jeffrey J. Teuteberg, M.D., evaluated plaintiff. R. 406-08. Dr. Teuteberg noted a slight improvement in plaintiff's edema, to 2 to 3+ bilaterally. R. 406. Plaintiff reported that he had been keeping his feet elevated during the day. *Id*. He also had pressure in his chest, including some brief episodes of sharp chest pain, but the symptoms could not be replicated. R. 407.

Prior to the edema, plaintiff's only significant cardiac history was a hypertension diagnosis in 1997. R. 406-07. The results of a recent electrocardiogram were unremarkable with the exception of borderline elevated pulmonary pressures. R. 407, 423. Dr. Teuteberg doubted that plaintiff's edema was caused by a cardiac issue. R. 407.

On July 3, 2007, plaintiff had a stress test to evaluate his symptoms of chest pain and

edema. R. 333-37, 412-14. The results indicated that he had abnormal functional capacity with a deconditioned heart rate response to exercise, but that the probability of plaintiff having any underlying serious coronary events or cardiac mortality was low. *Id*. Dr. Teuteberg released plaintiff back to physical therapy. R. 246, 260.

On July 19, 2007, plaintiff was re-evaluated for work hardening. R 246, 260. He had 2+ pitting edema. *Id*. PT Colombo's treatment notes reflect that tests of plaintiff's cardiac systems, liver function, kidneys, and blood work did not reveal why he had experienced a sudden onset of edema. *Id*. PT Colombo planned to improve plaintiff's awareness of body mechanics, cardiovascular health, and trunk strength so he could return to work without restrictions. *Id*.

On July 20, 2007, plaintiff reported for work hardening and complained of all-night cramping. R. 245. Plaintiff stated that he planned to see his doctor that day to review lab results. *Id*.

On August 8, 2007, PT Colombo discharged plaintiff from work hardening due to lack of correspondence. R. 237. Plaintiff had failed to show up for several scheduled appointments after receiving clearance to return from his cardiologist. *Id*.

On August 17, 2007, Dr. Teuteberg re-evaluated plaintiff's persistent edema. R. 405-06. Plaintiff had 1 to 2+ edema. R. 406. Dr. Teuteberg remarked that the etiology of the edema remained unclear, but he did not attribute it to medication. *Id*. Dr. Teuteberg opined that further diuresis would not improve plaintiff's condition. *Id*. He ordered venous studies of plaintiff's lower extremities and recommended compression stockings. *Id*.

On November 16, 2007, plaintiff had a follow up with Dr. Teuteberg. R. 378-79, 404-05. He reported that his back pain prevented him from engaging in aerobic activity and limited him to stretching. R. 378, 404. Dr. Teuteberg noted that plaintiff's edema had improved significantly

since he resumed use of the diuretic hydrochlorothiazide. R. 378-79, 404-05. At the time of the visit plaintiff had trace edema in his left leg. R. 378, 404. Dr. Teuteberg could still not identify the cause of plaintiff's edema, but speculated that plaintiff had venous insufficiency. R. 378-79, 404-05.

On December 5, 2007, plaintiff's primary care physician, Gary Sauer, M.D.,[5] noted plaintiff's history of lower extremity edema and observed that he did not have any edema at that time. R. 325.

On July 25, 2008, plaintiff presented to Dr. Sauer with a burning sensation in his feet. R. 319. He informed Dr. Sauer that he considered his current narcotic regimen to be "stable." R. 317. Plaintiff stated that he did not exercise due to back pain. R. 318.

On August 8, 2008, plaintiff again expressed to Dr. Sauer that his back pain prevented him from exercising regularly. R. 366.

Plaintiff visited Ohio Valley General Hospital ("OVGH") on several occasions for bleeding varicosities in his legs and feet and pain management. On October 27, 2008, plaintiff reported to the emergency room of OVGH ("the ER") after the top of his right foot began "squirting blood." R. 505. The bleeding was controlled when plaintiff arrived at the ER, but bleeding resumed upon cleaning the wound. R. 508. The wound was dressed and plaintiff was discharged. *Id.*

On December 19, 2008, plaintiff again presented to the ER with a varicosity in his foot that had been bleeding for two and a half hours. R. 491-96. ER attendants applied gelfoam pressure dressing and elevated plaintiff's leg. R. 498.

On July 24, 2010, plaintiff returned to the ER with another episode of uncontrolled

---

[5] Plaintiff submitted additional records from Dr. Sauer for the ALJ's consideration, but the majority of these records were unrelated to his primary impairments. R. 317-392.

bleeding. R. 480. The attending physician closed the wound on plaintiff's leg with a suture and applied a gelfoam dressing. R. 487.

On August 2, 2010, plaintiff had his first appointment with Vidhu K. Sharma, M.D., at the Wound Healing Institute ("WHI") of OVGH for treatment of three active wounds on his lower extremities. R. 446-47. Dr. Sharma debrided the wounds, ordered a venous doppler study and recommended an evaluation by a vascular surgeon. R. 447-48. Plaintiff had trace edema in his lower extremities. R. 446-47. Dr. Sharma acknowledged plaintiff's history of intermittent edema, but did not consider plaintiff to have "significant issues" with it. *Id*. Dr. Sharma advised plaintiff to continue using diuretics as directed. R. 448. Plaintiff also reported that his current drug regimen provided "fairly good" relief for his chronic lower back pain. *Id*.

On August 3, 2010, plaintiff presented to the ER for uncontrolled bleeding from his leg. R. 472, 476. He was diagnosed with a statis ulcer. R. 478. Plaintiff was discharged and exited the ER with a "steady gait." *Id*.

On August 9, 2010, plaintiff had a follow-up at WHI to address recurring bleeding from superficial varicosities. R. 444-45. Dr. Sharma consulted Dr. Sullivan, a vascular surgeon, who recommended compression stockings to decrease the pressure of superficial circulation. *Id*. Dr. Sullivan also suggested a vascular workup to determine whether plaintiff had venous reflux or would be a candidate for vein ablation. R. 444. He advised against any additional treatment until plaintiff tried compression stockings. R. 444-45.

On August 27, 2010, plaintiff's vascular workup revealed evidence of deep vein reflux, perforator reflux, and great saphenous vein reflux in both extremities, but there was no indication of deep vein thrombosis. R. 440, 451-55.

On September 8, 2010, Dr. Sharma re-evaluated plaintiff. R. 442. Plaintiff presented with

trace to 1+ bilateral lower edema, but without any active wounds.[6] *Id*. Plaintiff reported that his symptoms were improving with compression. *Id*. Dr. Sharma provided plaintiff with a new pair of compression stockings and advised him to continue wearing them during the day. *Id*. Plaintiff was discharged from Dr. Sharma's care. *Id*.

On March 7, 2011, plaintiff presented to the ER with complaints of chronic back pain, abdominal pain, nausea, vomiting and a fever. R. 462. Plaintiff explained that he required pain management care because his doctor, Rudolph Merick, M.D., was unavailable. R. 462, 464. Plaintiff emphasized that he was a pharmacist and stressed the importance of pain medication for a chronic condition. R. 466. Plaintiff was given Dilaudid and Zofran and discharged with a prescription for Zofran. *Id*. The nurse noted that plaintiff was ambulatory when leaving the ER. R. 468.

On April 4, 2011, plaintiff underwent an initial comprehensive physical evaluation by Milton J. Klein, D.O., a physiatrist and pain management specialist. R. 462, 560. Plaintiff presented with chronic back pain and radicular pain in his lower extremities that was more pronounced on the right. R. 560. Plaintiff also had bilateral distal sensory impairment. *Id*. Plaintiff explained that he had been unable to find a new pain management provider after Dr. Merick closed his practice. *Id*. He also had been prescribed Clonidine for narcotic withdrawal. *Id*. Plaintiff further explained that when he was unable to continue the narcotic regimen prescribed by Dr. Merick, he had taken Percocet leftover from a prior prescription and "borrowed" hydrocodone with acetaminophen from his mother. R. 560-61. Dr. Klein observed that plaintiff had a moderate limp on his right and was using a straight cane on that side.[7] R.

---

[6] Dr. Sharma's September 8, 2010 notes are the last report of edema in the record. R. 442.
[7] Dr. Klein's April 4, 2011 notes are the first indication that plaintiff was utilizing a cane to

562.

Dr. Klein diagnosed plaintiff with chronic intractable lower back pain with right lower

extremity radiculitis and post laminectomy syndrome.  R. 562.  He modified the drug regimen

prescribed by Dr. Merick, adding Nucynta, prescribing Suboxone instead of OxyContin and

Oxycodone, and replacing Gabapentin with Lyrica.  *Id*.  Dr. Klein noted that Dr. Merick had

prescribed Zaroxolyn for plaintiff's lower extremity pitting edema.[8]  R. 561.  Dr. Klein

encouraged plaintiff to engage in activities and independent exercise as tolerated.  R. 562.

On May 2, 2011, plaintiff had a follow up with Dr. Klein.  R. 559.  Dr. Klein re-prescribed

OxyContin after plaintiff reported that Suboxone did not provide adequate pain relief and he

experienced unspecified adverse side effects.  *Id*.  Dr. Klein noted that plaintiff's lumbosacral

ranges of motion continued to be limited.  *Id*.

On May 31, 2011, Dr. Klein re-evaluated plaintiff.  R. 558.  Plaintiff reported that

OxyContin and Nucynta had improved his quality of life and tolerance for activities.  *Id*.

Nucynta had reduced plaintiff's bilateral foot paresthesia.  *Id*.  Plaintiff denied any adverse

effects from the medications, but attributed decreased sleep quality to the Nucynta.  *Id*.  Dr.

Klein characterized this adverse side effect as "paradoxical," but advised plaintiff to take half

tables of the medication.  *Id*.  Dr. Klein attributed plaintiff's limited lumbosacral ranges of

motions to paralumbar muscle spasm.  *Id*.  He indicated that plaintiff "remains permanently work

disabled for usual occupation duties due to the November 16, 2006 occupational lower back

---

ambulate.  R. 561.  Plaintiff indicated in his application that the cane had been prescribed in
2007.  R. 174.  Plaintiff testified that he needed the cane to walk unless he had something to lean
on.  R. 35, 39.

[8] Plaintiff testified that he was still taking diuretic medication prescribed by Dr. Merick for the
edema.  R. 38.

injury and post failed back surgery." *Id*.

On July 26, 2011, plaintiff had another follow up with Dr. Klein. R. 587-88. Plaintiff complained of chronic aching, throbbing and radiating pain in his lower back. R. 587. Dr. Klein noted decreased lumbar lordosis, tender lumbar spinous processes and facet joints, and his lumbar muscles were painful upon extension. *Id*. In contrast, plaintiff had normal muscle tone and bulk. *Id*. Dr. Klein opined that plaintiff's lower back pain "moderately limits activities." *Id*. He modified his prior disability statement to reflect that the injury was "compensable." R. 588.

Dr. Klein's treatment notes from plaintiff's September 20 and November 15, 2011 appointments are virtually identical to the notes from July 26, 2011, with the exception of a carbon copy to plaintiff's Workers' Compensation attorney. R. 582-84, 585-86.

Dr. Klein also saw plaintiff on January 10, April 3, and June 26, 2012. Dr. Klein's examination findings essentially remained the same. R. 579-81, 576-78, 573-75.

On August 6, 2012, Dr. Klein completed a Medical Source Statement ("MSS"). R. 566. He indicated that he had treated plaintiff every three months since April 4, 2011 and had diagnosed him with chronic low back pain, right lower extremity radiculitis, and post laminectomy syndrome. *Id*. Plaintiff's tolerance for physical activity was "significantly" limited due to lower back pain and the lower extremity radicular pain. *Id*. Dr. Klein was unaware of any adverse side effects from plaintiff's medication, but nevertheless indicated this was one of the many reasons plaintiff would require extensive breaks at work. R. 566-67. Dr. Klein opined that plaintiff's impairments were expected to last for at least 12 months. R. 566.

Dr. Klein assessed plaintiff's functional limitations as follows. R. 567-69. Plaintiff could not walk more than one or two city blocks without a break. R. 567. Plaintiff could sit for thirty minutes and stand for one hour at a time. *Id*. He could sit or stand for a total of two hours in an

eight-hour workday.  *Id*.  Plaintiff must be permitted to change positions at will.  *Id*.  He also would need to walk for ten minutes at a time five times a day.  *Id*.  Plaintiff required unscheduled twenty-minute breaks three times a day due to chronic fatigue, pain/paresthesia, numbness, and adverse effects from medication.  *Id*.  If plaintiff were required to sit for an extended period, his legs would need to be elevated to waist level for forty percent of the workday due to lower extremity radicular pain.  R. 568.  Dr. Klein opined that plaintiff did not require a cane or another assistive device for occasional standing or walking.  *Id*.  Plaintiff could carry up to ten pounds frequently, and ten pounds occasionally, but could never carry over twenty pounds.  *Id*.  Plaintiff would be off-task twenty five percent of the time or more, would have good days and bad days, and would miss work over four days a month.  R. 569.  Plaintiff was capable of handling moderate work-related stress.  *Id*.  Dr. Klein did not identify any other limitations.  *Id*.

On September 18, 2012, plaintiff had his last visit of record with Dr. Klein.  R. 570. Plaintiff reported an increase in upper lumbar and lower thoracic back pain over the past two or three months and requested sustained release Roxicodone for breakthrough pain.  *Id*.  Plaintiff was not experiencing adverse side effects from medication and reported an improved tolerance for activities.  *Id*.  Dr. Klein assessed plaintiff's condition as stable.  *Id*.

On July 5, 2011, State Agency Physician Mary Ellen Wyszomierski, M.D., reviewed plaintiff's medical records and rendered a Residual Functional Capacity Assessment.  R. 49-52. Dr. Wyszomierski determined that plaintiff could lift and carry up to ten pounds frequently.  R. 50.  With normal breaks, plaintiff could stand or walk and could sit for six hours of an eight-hour day.  *Id*.  Due to degenerative disease of plaintiff's lumbar spine, plaintiff had postural limitations which would limit him only to occasional climbing of ramps or stairs, balancing, kneeling or crouching.  R. 50-51.  Plaintiff could not climb ladders, ropes or scaffolds and had to avoid

concentrated exposure to extreme temperatures, wetness, vibrations and work hazards.  R. 51.

### 2. The ALJ's Opinion

After consideration of the above, the ALJ determined that plaintiff could perform

sedentary work as defined in 20 C.F.R. 404.1567(a), with the following restrictions:

> He can lift up to 10 pounds occasionally, stand and walk for 2 hours in an 8 hour
> workday and sit for up to 6 hours in an 8-hour workday with normal breaks.  The
> claimant can occasionally climb ramps and stairs but never climb ladders, ropes or
> scaffolds.  He can occasionally balance, stoop, kneel, crouch and crawl but he
> should avoid concentrated exposure to extreme cold and wetness and he must
> avoid vibrations and hazards like moving machinery.  The claimant would be
> allowed to alternate standing and sitting every two to three hours at will.  Finally,
> the clamant would need to elevate his lower extremities to waist height twice per
> day for 10 minutes each time, which the claimant would be able to do while on
> break.

R. 15.  Consistent with the testimony provided by the vocational expert, the ALJ determined that

although plaintiff was unable to perform his past relevant work as a pharmacist, he could

perform the requirements of jobs such as ticket checker, order clerk and addresser.  R. 21-22, 40.

Accordingly, the ALJ concluded that plaintiff was "not disabled" from January 30, 2007 through

December 27, 2012.  R. 12, 22-23, 20 C.F.R. §§ 404.1520(g), 416.920(g).

In rendering this residual functional capacity assessment ("RFCA") and determination on

disability, the ALJ reasoned that although plaintiff's degenerative disc disease and edema could

reasonably be expected to cause the symptoms alleged by plaintiff, his statements concerning the

intensity, persistence and limiting effects of those symptoms "were not credible to the extent they

were inconsistent with the RFCA."  R. 16.  The ALJ highlighted the absence of continuing

edema in plaintiff's treatment records, his reports to his treating physicians that his leg symptoms

were improving, and plaintiff's failure to comply with treatment directives (including a failure to

take medication as prescribed).  R. 20-21.  The ALJ also declined to assign significant weight to

the records and opinions of Dr. Klein because they were inconsistent with his own objective

findings as well as the findings of plaintiff's other physicians.  R. 21.

Plaintiff argues that the ALJ erred by (1) according minimal weight to the opinion of treating physician, Dr. Klein and (2) finding plaintiff's statements regarding his pain and limitations were not entirely credible.  The government contends that the ALJ appropriately evaluated the findings and opinions of Dr. Klein and properly assessed the credibility of plaintiff.

### III.    STANDARD OF REVIEW

This Court's review is limited to determining whether the Commissioner's decision is "supported by substantial evidence."  42 U.S.C.  § 405(g); *Adorno v.  Shalala*, 40 F.3d 43, 46 (3d Cir. 1994).  The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record.  *Monsour Medical Center v.  Heckler*, 806 F.2d 1185, 1190-1191 (3d Cir. 1986).  Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C.  § 405(g).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Pierce v.  Underwood*, 487 U.S.  552, 565 (1988) (internal quotation marks omitted).  As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v.  Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  "Overall, the substantial evidence standard is a deferential standard of review." *Jones v.  Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period."  *Stunkard v.  Secretary of*

*Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v. Sec'y of Health, Educ. & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively delegated rule-making authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity."[20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the

claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (footnotes omitted).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. In *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194 (1947), the Supreme Court explained:

When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196.

The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001). Thus, the court's review is limited to the four corners of the ALJ's decision.

## IV. DISCUSSION

Plaintiff's contention that the ALJ erred in discounting Dr. Klein's opinions and assessments is unavailing. The ALJ gave appropriate weight to Dr. Klein's findings and assessments where they were supported by the objective information and test results in his treatment records and merely rejected the limitations he imposed where they were unsupported or sufficiently undermined.

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord

treating physicians' reports great weight, especially "'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)); *see also Allen v. Bowen*, 881 F.2d 37, 41 (3d Cir. 1989); *Podedworney v. Harris*, 745 F.2d 210, 217-18 (3d Cir. 1984).  But it equally is well settled that the ALJ retains the discretion to assign "more or less weight [to such a report] depending upon the extent to which supporting explanations are provided."  *Plummer*, 186 F.3d at 429.  Where the record contains additional medical evidence that contradicts or undermines a treating physician's assessment, the ALJ retains discretion to assign an appropriate level of weight to each assessment and resolve the conflicting evidence.  *See Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir. 1985) ("in light of this conflicting medical evidence, the [ALJ] could reasonably find the lack of clinical data, indicating active phlebitis, outweighed the testimony of Newhouse and her treating physicians.").  Accordingly, an ALJ may properly assess the credibility of medical opinion evidence and may give little or no weight to unsupported or internally inconsistent opinions.  20 C.F.R. § § 404.1527(c)(2), (d)(4), 416.927(c)(2).

The ALJ declined to assign significant weight to the disabling limitations rendered by Dr. Klein for several reasons.  R. 21.  The record contained substantial evidence to support each of these reasons.

First, the record contained evidence that plaintiff's edema was no longer producing disabling limitations.  Dr. Klein's records demonstrate that plaintiff reported improving symptoms in his legs.  Dr. Klein specifically examined and monitored plaintiff's legs and feet during his course of treatment.  Throughout Dr. Klein's medical management of plaintiff's impairments he did not note any edema.  The absence of edema was consistent with records from

WHI, where plaintiff was treated for edema and venous insufficiency and discharged in stable condition. In fact, none of plaintiff's treatment providers indicated that plaintiff had edema after September of 2010. R. 442.

Second, plaintiff's treatment records consistently revealed that his chronic back pain and resulting radiculopathy were managed with medication. On multiple occasions plaintiff informed his treatment providers that his drug regimen alleviated his chronic lower back pain. R. 317, 448. Plaintiff also reported a reduction in bilateral foot paresthesia with the use of Nucynta. R. 558. Moreover, Nucynta and OxyContin increased plaintiff's tolerance for activities and improved his overall quality of life. *Id.* On the two occasions that plaintiff complained of adverse side effects Dr. Klein adjusted or discontinued plaintiff's medication accordingly.[9] The record was devoid of other instances where plaintiff complained of adverse side effects. In fact, plaintiff persistently sought to maintain his medication regimen without raising such complaints.

Moreover, on September 18, 2012, plaintiff had his last visit of record with Dr. Klein. R. 570. He reported an increase in upper lumbar and lower thoracic back pain over the past two or three months and requested sustained release Roxicodone for breakthrough pain. *Id.* Plaintiff further reported that he was not experiencing adverse side effects from medication and had gained an improved tolerance for activities. *Id.* Dr. Klein provided the requested medication and assessed plaintiff's condition as stable. *Id.*

Of course, the ability to control a limitation with medication or treatment is a factor which the ALJ may consider in assessing the severity of an impairment. *Welch v. Heckler*, 808

---

[9] Dr. Klein addressed plaintiff's complaints of adverse side effects regarding Suboxone by discontinuing the medication and advised plaintiff to take half tablets of Nucynta in order to alleviate "paradoxical" complaints of poor sleep quality. R. 558-59.

F.2d 264 (3d Cir. 1986). And it equally is well accepted that if a condition can be controlled with medication or treatment, it is not disabling under the Act. *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986); *Reed v. Sullivan*, 988 F.2d 812, 814 (8th Cir. 1993); *see also* 20 C.F.R. §404.1530(b). Here, the record as a whole provided sufficient evidence to support the ALJ's assessment that the limitations from plaintiff's chronic low back pain syndrome were notably improved through the use of medications and that these medications did not produce disabling side effects.

Third, the ALJ's assessment of plaintiff's RFC was supported by substantial evidence. Plaintiff specifically contends that the ALJ substituted her own lay opinion for that of Dr. Klein by limiting plaintiff to elevating his legs only twice daily for ten minutes at a time during normal breaks. R. 568. But formulating a claimant's RFCA is an administrative finding, not a medical finding. Such an undertaking is specifically reserved for the ALJ. *See Burns v. Barnhart*, 312 F.3d 113, 129 (3d Cir. 2002) (formulating a claimant's RFC is a factual undertaking that is reviewed pursuant to "substantial evidence standard of review" and such assessments are to be upheld where they account for every credible limitation established by the record).

As aptly noted by the ALJ, Dr. Klein's rendering of limitations that suggested the inability to engage in all forms of gainful activity was inconsistent with his own objective findings. His records do not reflect that plaintiff was severely limited by his impairments. To the contrary, Dr. Klein's records of treatment consistently indicate that plaintiff was only moderately limited by his impairments and his tolerance for activities improved with medication. R. 566, 570, 573, 576, 579, 582, 585, 587. In addition, Dr. Klein repeatedly recommended that plaintiff engage in activities and independent exercise, which contradict the limitations proposed in the MSS. Thus, there was substantial evidence to support the ALJ's determination not to

include the severe limitations in the MSS and plaintiff's contentions to the contrary are misplaced.

Moreover, the ALJ did not entirely disregard the limitations identified by Dr. Klein. The ALJ's RFCA was consistent with plaintiff being able to walk two city blocks without a break, walk for several minutes multiple times during the work day, sit for thirty minutes, stand for an hour, sit for extended periods of time, elevate his legs periodically, carry up to ten pounds frequently, and handle moderate work-related stress. Thus, the ALJ credited many of the limitations identified by Dr. Klein.

Furthermore, the ALJ did not disregard Dr. Klein's recommendation that plaintiff elevate his legs to alleviate radiculopathy; he merely reduced the time plaintiff would be able to do so. And Dr. Klein's treatment records do not include any notation that plaintiff should elevate his legs for any period. The ALJ appropriately discounted this and other disabling limitations rendered by Dr. Klein on the ground that they were unsupported by the record. It follows that the ALJ's formulation of plaintiff's RFCA is supported by substantial evidence.

Fourth, it was within the ALJ's discretion to disregard Dr. Klein's conclusion that that plaintiff was disabled. R. 558, 571, 575, 577, 580, 583, 588. In general, an ALJ does not have an unwavering obligation to accept a treating physician's opinion of disability and the ultimate determination of disability is reserved to the Commissioner. *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 148 (3d Cir. 2007) ("An ALJ need not defer to a treating physician's opinion about the ultimate issue of disability because that determination is an administrative finding reserved to the Commissioner."). Dr. Klein's records and summaries of treatment repeatedly noted that plaintiff was disabled from "usual occupational duties." R. 571, 575, 577, 580, 583, 586, 588. It is clear from the use of such language that these assessments were

rendered in the context of a Workers' Compensation claim. These assessments have minimal value because the standards governing Pennsylvania Workers' Compensation claims are not identical to the standards applied under the Act. *See e.g., Hartranft*, 181 F.3d at 362, *Coria v. Heckler*, 750 F.2d 245, 247 (3d Cir. 1984) (recognizing different standards apply in determining disability under the Act and Pennsylvania's workers compensation program and opining that an ALJ may reasonably decline to assign significant weight to medical records where the opinions therein relate to workers compensation claims). Thus, Dr. Klein's records of treatment were devoid of prior assessments that suggested total disability under the Act.

Fifth, plaintiff's assertion that Dr. Klein's opinions and assessments should have been given great weight due to the frequency of treatment is also misplaced. The opinion of a treating physician is given great weight where it provides a "longitudinal picture" of a plaintiff's impairment. 20 C.F.R. §404.1527(c)(2). Dr. Klein treated plaintiff for approximately eighteen months and the relationship was formed years after plaintiff's alleged onset date.

Sixth, during this time, the frequency of plaintiff's office visits was reduced from monthly to every three months. Dr. Klein's records essentially were repetitive and unchanged over the course of fifteen months. Under these circumstances the ALJ was entitled to assess Dr. Klein's opinions and assessments based on the limited duration of the relationship, the consistent notations of stability, and the setting in which the treatment relationship occurred.

The ALJ also was entitled to give greater weight to the objective findings from the examinations performed by treating physicians Dr. Sauer and Dr. El-Kadi. They both treated plaintiff before and after his alleged onset date. Their findings were supported by competent evidence, internally coherent and consistent with the record. 20 C.F.R. § §404.1527(f)(1), 416.927(f)(1); Social Security Ruling ("SSR") 96-6p. In contrast to Dr. Klein's opinion that

plaintiff could not work, Dr. El-Kadi and PT Colombo indicated that plaintiff was capable of performing light-medium work and prescribed work hardening so that he could return to work without restrictions. Dr. Sauer consistently noted that plaintiff believed he was stable on his medication regimen. None of these treatment providers suggested that plaintiff could not work or imposed disabling limitations. Thus, the ALJ's decision to afford Dr. Klein's assessment minimal weight was supported by these facets of the medical evidence as well.

Plaintiff's allegation that the ALJ provided insufficient reasons for discrediting plaintiff's statements regarding his pain and limitations is unavailing. The ALJ appropriately assessed plaintiff's credibility and provided sufficient reasons for determining that plaintiff was not fully credible.

In evaluating a claimant's asserted limitations, an ALJ must accord subjective complaints the same treatment as objective medical reports in that he must weigh all the evidence before him and explain his or her reasons for crediting and/or rejecting such evidence. *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 122 (3d Cir. 2000). In doing so serious consideration must be given to subjective complaints where a medical condition exists that could reasonably produce the claimed symptoms. *Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993). When medical evidence provides objective support for the subjective complaint, the ALJ can only reject such a complaint by highlighting contrary objective medical evidence. *Mason*, 994 F.2d at 1067-68. And "in all cases in which pain or other symptoms are alleged, the determination or decision rationale must contain a thorough discussion and analysis of the objective medical and the other evidence, including the individual's complaints of pain or other symptoms . . . . The rationale must include a resolution of any inconsistencies in the evidence as a whole and set forth a logical explanation of the individual's ability to work." *Schaudeck v.*

*Commissioner of Social Security*, 181 F.3d 429, 433 (3d Cir. 1999) (citing S.S.R. 95-5p at 2 (1995)).

The ALJ had ample reason to question the veracity of plaintiff's testimony regarding his pain, symptoms and resulting limitations. R. 16. And the ALJ explained why the record did not objectively support plaintiff's complaints of disabling pain and limitations. R. 17-20. In doing so, she highlighted the inconsistencies between plaintiff's testimony and the treatment notes. R. 20-21. In accordance with 20 C.F.R. § §404.1527(f)(1), 416.927(f)(1) and Social Security Ruling ("SSR") 96-6p, the ALJ also considered plaintiff's activities of daily living; the location, duration, frequency, and intensity of his pain or other symptoms; aggravating and precipitating factors; and plaintiff's treatment and medication, including side effects. R. 16.

The ALJ was at liberty to discredit plaintiff's testimony regarding the management of his edema because the records reflect that edema was not a continuing impairment. Dr. Klein, who examined plaintiff periodically over the eighteen months prior to the hearing, did not note any edema during his physical examination of plaintiff's legs and feet. R. 20-21. In fact, none of plaintiff's treatment providers noted the presence of edema after September of 2010. R. 442.

Plaintiff testified that he controlled his edema by elevating his legs as much as seventy-five percent of the day, but the record did not reflect that any of plaintiff's treatment providers advised him to do so in order to manage the condition. Plaintiff's testimony also stood in contrast with Dr. Klein's recommendation that plaintiff elevate his legs to alleviate radiculopathy.

Plaintiff also testified that he managed his edema with diuretic medication prescribed by Dr. Merick, whom he had not seen since 2011. R. 38, 462, 464. There is no indication that the treatment providers who evaluated plaintiff's edema prescribed additional diuretic medication.

The record clearly demonstrates that plaintiff's edema was managed with compression stockings, which were recommended to him as early as 2007. R. 406. In September of 2010, which was the last report of edema in the record, plaintiff only had trace edema and reported that his leg symptoms were improving with compression. R. 442. This body of evidence provided substantial support for the ALJ's assessment of the limitations produced by the impairment.

The ALJ was entitled to discount plaintiff's testimony regarding radiculopathy because plaintiff consistently reported that his symptoms were improving. The ALJ noted Dr. Klein's findings that plaintiff had symmetrical reflexes and little loss of sensation in his legs and plaintiff reported that his leg symptoms had improved with Nucynta.[10] R. 20.

The record also reflected that plaintiff's chronic back pain was managed with medication. Plaintiff informed his treatment providers that his narcotic regimen was "stable" and provided "adequate relief" of his chronic back pain. R. 317, 448. There were three instances where plaintiff requested pain management care. In one instance, he presented to the ER when Dr. Merick closed his practice. R. 462, 464. Shortly thereafter, Dr. Klein began managing plaintiff's pain. *Id*. Plaintiff requested only two modifications of his drug regimen due to inadequate pain relief. R. 559, 570. This body of evidence provided substantial support for the ALJ's determination that plaintiff's chronic back pain did not produce limitations precluding all forms of gainful activity.

Similarly, plaintiff's testimony regarding adverse side effects from medication is unsupported by the record. Plaintiff reported side effects from medication only twice, and on each occasion his complaints were resolved by medication adjustments. R. 175-76, 558-59, 566-

---

[10] The ALJ attributes plaintiff's improvement to Fortesta, but the records reflect that Nucynta alleviated his radiculopathy. R. 20, 558.

67, 570.

The ALJ similarly had discretion to discount plaintiff's testimony regarding the use of a cane. Plaintiff testified that he used the cane daily and needed it to walk unless he had something to lean on. R. 35, 39. In his application, plaintiff reported that the cane had been prescribed in 2007. R. 174. The record is devoid of any prescription for a cane or even any reference to plaintiff using a cane until Dr. Klein's treatment notes from April of 2011. R. 561. In fact, notes from plaintiff's visit to the ER in March of 2011 indicate that he was ambulating out of the emergency room without difficulty and do not mention any assistive device. R. 468. Treatment notes from a prior visit to the ER in August of 2010 likewise reflect that plaintiff exited the emergency room with a "steady gait" and also did not indicate that he was using a cane. R. 478. According to Dr. Klein's MSS, plaintiff did not require a cane for occasional walking.[11] R. 566. Thus, there was a basis in the record to support the ALJ's determination that plaintiff's claimed need for an assistive walking device did not render plaintiff unable to perform work-related activities consistent with the RFCA.

Moreover, the ALJ referenced multiple instances where plaintiff failed to comply with treatment directives or take medication as prescribed. R. 20-21. In this regard, the ALJ

---

[11] Plaintiff submitted a letter by Dr. Klein dated January 24, 2013, to the Appeals Council. That letter indicated that a cane was medically necessary for plaintiff to ambulate. R. 589-590. This letter was not in the record at the time the ALJ made her decision.

Since this letter was submitted only to the Appeals Council, it is excluded from this Court's review. *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001) (holding that a plaintiff cannot use evidence that was not before the ALJ to contend that the ALJ's decision was not supported by substantial evidence)).

Plaintiff likewise has failed to make the appropriate request and showing necessary for a remand to have the letter considered by the ALJ. *Id.* at 594 ("[W]hen the claimant seeks to rely on evidence that was not before the ALJ, the district court may remand to the Commissioner but only if the evidence is new and material and if there was good cause why it was not previously presented to the ALJ."))

highlighted among other things plaintiff's testimony that he continued to manage his edema with leftover diuretic medication that had been prescribed by Dr. Merick at least twenty-two months earlier and plaintiff's failure to complete the work-hardening program prescribed by Dr. El-Kadi as instances where plaintiff had failed to follow through with prescribed treatment. R. 20. Of course, the failure to follow through with prescribed courses of treatment is a factor that the ALJ may consider in assessing the severity of an impairment. *See Vega v. Comm'r of Soc. Sec.*, 358 F. App'x 372, 375 (3d Cir. 2009) ("[A]n ALJ may consider a claimant less credible if the individual fails to follow the prescribed treatment plan without good reason."); *Pounds v. Colvin*, 2014 WL 3845728, *4 (W.D. Pa. Aug. 4, 2014) (Diamond, J.) ("the ALJ appropriately considered plaintiff's noncompliance with treatment in assessing the limiting effects of plaintiff's symptoms, which he is authorized to do under 20 C.F.R. § 416.929(c)(3)(iv) and (v) and SSR 96–7p.").

The above-referenced instances provided substantial support for the ALJ's assessment of plaintiff's claimed symptoms and limitations. And because the ALJ's decision contained a discussion of the record and other factors that persuasively undermine plaintiff's subjective complaints of pain and resulting limitations, the ALJ did not err in finding plaintiff's subjective complaints not fully credible. *Mason*, 994 F.2d at 1067-68.

## V.    CONCLUSION

It is well settled that disability is not determined merely by the presence of impairments, but by the effect that the impairments have on an individual's ability to perform substantial gainful activity. *Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991). In making assessments of the impact impairments have on a particular individual's ability to do work related activities, determinations of credibility are committed to the sound discretion of the ALJ and must be

upheld where there is substantial evidence to support them. *Hartranft*, 181 F.3d at 362. Here, the record contained substantial evidence to support the ALJ's assessment of the medical evidence of record as a whole and plaintiff's subjective complaints. Accordingly, the Commissioner's decision must be affirmed.

For the reasons set forth above, plaintiff's motion for summary judgment will be denied, the Commissioner's motion will be granted, and final judgment will be entered in favor of the Commissioner and against Plaintiff. Appropriate orders will follow.

Date:  January 15, 2015

s/David Stewart Cercone
David Stewart Cercone
United States District Judge

cc:    Jennifer Modell, Esq.
       Paul D.  Kovac, AUSA

       (*Via CM/ECF Electronic Mail*)